### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

COAL RIVER MOUNTAIN WATCH,
APPALACHIAN VOICES, WEST VIRGINIA
HIGHLANDS CONSERVANCY, and
SIERRA CLUB

        *Plaintiffs*,

        v.                                           Civil Action No. 3:25-cv-00103

COLONEL JAYSON PUTNAM,
in his official capacity as District Engineer,
U.S. Army Corps of Engineers, Huntington District,
WILLIAM H. GRAHAM JR., in his official
capacity as Commander and Chief of Engineers,
U.S. Army Corps of Engineers, and
UNITED STATES ARMY CORPS OF
ENGINEERS,

        *Defendants*.

### COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.      Plaintiffs challenge the August 1, 2023 issuance of Permit No. LRH-2020-631-BCR under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, by the Huntington District of the United States Army Corps of Engineers ("Corps") to Alpha Metallurgical Resources, Inc. ("Alpha") for its Turkeyfoot Surface Mine in Raleigh County, West Virginia.

2.      In issuing Permit No. LRH-2020-631-BCR (hereinafter, "the Turkeyfoot Permit"), the Defendants failed to comply with the CWA, 33 U.S.C. § 1344 *et seq*., its Public Interest Review regulation, 33 C.F.R. § 320.4, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §

4321 *et seq*., and failed to engage in reasoned decision-making under the federal Administrative Procedures Act ("APA") 5 U.S.C. § 551 et seq.

3.    The Turkeyfoot Permit authorizes the construction of four durable rock valley fills, four instream ponds, eight culverted stream crossings, and one mine through associated with the Turkeyfoot Surface Mine. The Turkeyfoot Permit authorizes Alpha to impact more than 3.5 miles of stream and 1.79 acres of wetland. The affected streams include Workman Creek and its tributaries (including McGraw's Fork and Right Fork), Sandlick Branch and its tributaries (including Wingove Branch), and Stover Fork and its tributaries.

4.    The Corps's analysis under the Section 404(b)(1) Guidelines (40 C.F.R. Part 230) violated the CWA. And the Corps's public interest review under 33 C.F.R. § 320.4 was arbitrary and capricious. Finally, the Corps's evaluation of the impacts of the Turkeyfoot Mine on the human environment violated NEPA. Because of those legal defects, as well as the Corps' failure to engage in reasoned decisionmaking, the Corps's issuance of the Turkeyfoot Permit must be set aside under the APA as arbitrary, capricious, and abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

5.    Plaintiffs respectfully request that the Court issue an order (1) declaring that the Corps violated the CWA, its public interest review regulations, NEPA, and the APA by issuing the Turkeyfoot Permit, (2) vacating the Turkeyfoot permit, and (3) awarding Plaintiffs their costs and expenses, including reasonable attorney and expert witness fees.

## JURISDICTION AND VENUE

6.    This action arises under the CWA, NEPA, and the APA. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202.

7.    Venue is appropriate in the Huntington Division of the United States District Court for the Southern District of West Virginia pursuant to 28. U.S.C. § 1391(e)(2) because a substantial part of the events or omissions giving rise to these claims occurred in the Corps's Huntington District Office (located at 502 Eighth Street in Huntington, West Virginia).

## PARTIES

8.    Defendant Colonel Jayson Putnam is the District Engineer for the Huntington District office of the U.S. Army Corps of Engineers in Huntington, West Virginia. The Huntington office is responsible for issuing permits for discharges of dredged and fill material into waters of the United States for most of West Virginia, including Raleigh County, under § 404 of the CWA.

9.    Defendant Lieutenant General William H. Graham, Jr., is the Chief of Engineers and Commander of the U.S. Army Corps of Engineers. He is charged with the supervision and management of all Corps decisions and actions, including the issuance of the Corps permits under § 404 of the CWA.

10.    Defendant U.S. Army Corps of Engineers is the federal agency charged with administering permits under § 404 of the CWA for the discharge of dredged or fill material into waters of the United States. The Corps is headquartered in Washington D.C., and has a District Office in Huntington, West Virginia, where a significant portion of the actions and omissions alleged in this Complaint occurred.

11.    Plaintiff Coal River Mountain Watch is a nonprofit organization incorporated in West Virginia. Its principal place of business in Naoma, West Virginia. CRMW works directly in

communities impacted by actions of the coal industry in southern West Virginia. Its activities include working with regulators to protect the health of these communities and promoting policy improvement through educating and challenging public officials. Its focus includes challenging coal industry practices which pollute water and air and destroy natural resources near its operations and threaten the unique culture and way of life of southern West Virginia communities.

12.     Appalachian Voices is a nonprofit North Carolina corporation committed to protecting the land, air, and water of the central and southern Appalachian region. Appalachian Voices has more than 1,000 members, the majority of which reside in Appalachia, including members in West Virginia. Its concerns include protection and restoration of West Virginia's waters.

13.     West Virginia Highlands Conservancy is a nonprofit organization incorporated in West Virginia. It has approximately 1,700 members. For more than five decades, the West Virginia Highlands Conservancy has been at the forefront of the environmental movement in West Virginia fighting to protect and conserve West Virginia's natural resources for future generations and to ensure a healthy and livable future in the Mountain State.

14.     Plaintiff Sierra Club is a nonprofit organization incorporated in California with more than 620,000 members and supporters nationwide, including approximately 2,000 members who reside in West Virginia and belong to its West Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; the practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural environment and to using all lawful means in carrying out these objectives. The Sierra Club's mission encompasses the restoration, enjoyment, and protection of surface water in West Virginia.

4

15.    Plaintiffs have members, such as Junior Walk, Michael Whitten, Debbie Jarrell, and Willie Dodson who use, enjoy, and benefit from water quality in Workman's Creek and its tributaries (including McGraw's Fork and Right Fork), Stover Fork and its tributaries, and/or Wingrove Branch of Sandlick Creek.

16.    Plaintiffs' members, such as Junior Walk, Michael Whitten, Debbie Jarrell, and Willie Dodson have environmental, recreational, and aesthetic interests in the minimization of the impacts from the Turkeyfoot Permit so that the overall health and integrity of the affected watersheds is preserved and maintained.

17.    The injuries to Plaintiffs and their members would be redressed by the relief requested because it would ensure that the Corps takes adequate consideration of the impacts of the Turkeyfoot Surface Mine, minimizes the impact of the mining operations on downstream waters and affected communities, and does not allow further mining until those actions are taken.

## LEGAL BACKGROUND

18.    Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that goal, the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit. *Id.* §§ 1311, 1344.

19.    One such permit is a permit under section 404 of the CWA.

20.    The CWA authorizes the Secretary of the Army to issue permits, under certain circumstances, "for the discharge of dredged or fill material into navigable waters at specified disposal sites." *Id.* at § 1344(a). The Secretary of the Army acts through the Chief of Engineers of the U.S. Army Corps of Engineers. *Id.* at § 1344(d); 33 C.F.R. § 323.6(a).

21.    Pursuant to CWA § 404(b)(1), the Environmental Protection Agency ("EPA") has, at the direction of Congress, promulgated regulations governing the Corps's review of proposed discharges of dredged or fill material under § 404, generally known as the "404(b)(1) Guidelines." *See generally* 40 C.F.R. Part 230. The "basic application, meaning, or intent of" the 404(b)(1) Guidelines cannot be modified without EPA rulemaking. *Id.* § 230.2(c). Accordingly, the Corps cannot unilaterally change its obligations under the 404(b)(1) Guidelines. A section 404 permit must be "denied if the discharge that would be authorized by such activity would not comply with" the Guidelines. 33 C.F.R. § 320.4(a).

22.    Pursuant to the 404(b)(1) Guidelines, no permits shall be issued (1) that does not implement the least environmentally damaging practicable alternative, (2) that will cause or contribute to violations of water quality standards, (3) that "will cause of contribute to significant degradation of waters of the United States," or (4) unless all appropriate and practicable steps have been taken to minimize impacts from the proposed discharges. 40 C.F.R. § 230.10(a)–(d).

23.    The Corps must make site-specific factual findings and determinations about proposed discharges, including a "determination of the cumulative effects on the aquatic ecosystem." *Id.* §§ 230.11–230.12 & 230.11(g).

24.    Under the Guidelines, "[n]o discharge of dredged or fill material shall be permitted if it . . . [c]auses or contributes . . . to violations of any applicable State water quality standard." 40 C.F.R. § 230.10(b). The 404(b)(1) Guidelines obligate the Corps to make factual determinations and findings of compliance or non-compliance with 40 C.F.R. § 230.10(b). *See* 40 C.F.R. §§ 230.11–12.

25.    The Corps has promulgated regulations requiring it to conduct a "public interest review" of every application it receives for all types of permits within its authority, including, but not limited to, Section 404 permits under the Clean Water Act.

26.    The Corps's public interest review is "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a).

27.    The Corps's public interest review regulations require it to weigh "[t]he benefits which reasonably may be expected to accrue from the proposal … against its reasonably foreseeable detriments." *Id.*

28.    Among the factors that the Corps must consider in its public interest review are general environmental concerns, water quality, and the needs and welfare of the people." *Id.*

29.    The Corps's unilateral policies prohibit the issuance of a section 404 permit if the "district engineer determines that it would be contrary to the public interest." *Id.*

30.    Because the Corps promulgated its public interest review regulations unilaterally and without EPA, those regulations cannot be construed to supersede or modify the Corps's 404(b)(1) Guidelines obligations, including its obligations to make reasoned and supported factual determinations and findings of compliance or noncompliance with 40 C.F.R. § 230.10(b). 33 U.S.C. § 1344(b)(1).

31.    The Corps's public interest review regulations require it to evaluate water quality considerations, although the regulation purports to allow the Corps to treat state certifications issued under section 401 of the CWA as conclusive on those considerations unless EPA "advises of other water quality aspects to be taken into consideration." 33 C.F.R. § 320.4(d).

32.     NEPA requires Federal agencies to prepare a detailed environmental impact statement ("EIS") for every major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). "If an agency decides not to prepare and EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998). Because NEPA requires a "hard look" at environmental impacts of a project an EIS must be prepared if there is a substantial possibility that a project may cause significant degradation. *Friends of Back Bay v. U.S. Army Corps of Eng'rs,*,681 F.3d 581, 590 (4th Cir. 2012).To succeed on a claim that an agency failed in its duty to prepare an EIS a plaintiff need not show that significant impacts are certain to occur but only that there are "substantial questions whether a project may have a significant effect." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 447 (9th Cir. 2024), *cert denied*, 2025 WL 76440 (U.S. Jan. 13, 2025).

33.     Under NEPA, the Corps must analyze direct and indirect environmental effects of the proposed action, including cumulative impacts. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2d Cir. 2975). This comports with the statutory intent of Congress in enacting NEPA" to remedy the situation where "[i]mportant decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades." S. Rep. No. 91-296, 91 Cong., 1st Sess. 5 (1969).

34.     A "cumulative impact" for purposes of NEPA is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually

minor but collectively significant actions taking place over a period of time." *Id* Cumulative actions are actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* at § 1508.25(a)(2). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.*

35.     NEPA requires that the Corps "insure the . . . scientific integrity of the discussions and analyses" in an environmental decision and "make explicit reference . . . to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24. A decision fails to comply with NEPA's "hard look" requirement when it avoids significant questions by shunting them aside with mere conclusory statements unaccompanied by supporting data.   *Center for Biological Diversity v. Nat. Highway Traffic Safety Admin.* 538 1172, 1223–24 (9th Cir. 2008); *see also Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 502 (4th Cir. 2023) ("Record evidence contrary to an agency's conclusion requires 'further elaboration' and must be 'grapple[d] with.'" (Quoting *Sierra Club v. United States Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018)); *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1383 (2d Cir. 1977) ("Where evidence presented to the preparing agency is ignored or inadequately dealt with, serious questions may arise about the adequacy of the authors' efforts to compile a complete statement.").

36.     An agency acts arbitrarily and capriciously when it determines the degree of a project's impact by giving greater or exclusive weight to the benefits and ignores adverse effects. *Sierra Club v. FERC,* 867 F.3d 1357, 1375 (D.C. Cir. 2017).

37.     The APA allows judicial review of final actions by administrative agencies such as the Corps. A court "shall hold unlawful and set aside agency actions, findings, and conclusions

found to be … arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency must "examine[]the relevant data and articulate[] a satisfactory explanation for its action." *Defenders of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019); *accord, Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983).  An agency's decision must include "a rational connection between the facts found and the choices made." *Defenders of Wildlife*, 931 F.3d at 345 (*quoting Motor Vehicle Mfrs. Ass'n.,* 463 U.S at 43).  An agency fails to meet this test when it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicles Mfrs. Ass'n.* 463 U.S. at 43.

38.     Although courts are generally deferential to an agency's predictive judgments, agencies are not free to "ignore the past when the past relates directly to the question at issue." *BellSouth Telecommunications, Inc. v. F.C.C.*, 469 F.3d 1052, 1060 (D.C. Cir. 2006). And a failure to provide a reasoned explanation as to why past water quality problems will not occur going forward is arbitrary and capricious. *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 501–05 (4th Cir. 2023).

## FACTS

39.     On April 4, 2022, the Corps issued public notice of Alpha's application for an individual section 404 permit for the Turkeyfoot Surface Mine. The April 4, 2022 notice was issued after revisions to a prior notice based on new determinations of impacts to waters of the Untied States. The notice provided that the project would include the discharge of dredged and/or fill material into 20,356 feet, or nearly 3.9 miles, of stream as well as 1.79 acres of wetland. The waters to be affected were listed as McGraw Fork, Workman Creek and its unnamed tributaries, Wingrove

Branch and its unnamed tributaries, unnamed tributaries of Stover Fork, and palustrine wetlands adjacent to Workman Creek.

40.     Appalachian Mountain Advocates submitted comments on behalf of Sierra Club and Appalachian Voices, among others.

41.     The U.S. EPA submitted comments in a letter dated July 14, 2021, advising the Corps of other water quality concerns that needed to be taken into consideration and reached the conclusion that "[b]ased on the information available to EPA, the discharges as proposed do not appear consistent with the [section 404(b)] Guidelines." Letter from Jeffrey D. Lapp, Chief, Wetlands Branch, U.S. Envtl. Prot. Agency Region III, to Michael Hatten, Chief, Regulatory Branch, Huntington District of the U.S. Army Corps of Eng'rs, Re: LRH-2020-00631; Alpha Met Resources, Turkeyfoot Surface Mine, Raleigh County, West Virginia (July 14, 2021), at 1.

42.     EPA noted its concern "about the potential of secondary and cumulative impacts to the aquatic resources within the project area and downstream." EPA Technical Comments on Turkeyfoot Surface Mine (LRH 2020-631-BCR), Alpha Met Resources, at 1. It advised that "[f]illing streams is not only a direct loss of aquatic habitat, but likely leads to secondary and cumulative impacts to the biogeochemical and hydrologic conditions of the receiving streams and could exacerbate the already impaired waters of Marsh Fork, Clear Fork, and Sandlick Creek." *Id.* at 2. EPA specifically recommended that the "applicant provide a robust analysis of secondary and cumulative impacts such as, but not limited to increased concentrations of pollutants, including but not limited to, sediment, sulfates, selenium or other ions. . . ." *Id.*

43.     EPA further recommended that "the applicant include a detailed discussion about the anticipated effects to the aquatic resources that may result from the current proposal, or if the applicant anticipates there will not be such effects, why no such effects will occur." *Id.*  EPA went

on to advise that, "[t]he discussion can be supported by information from other nearby operations utilizing the same mining methods in similar strata." *Id.*

44.    EPA specifically advised that "[t]he provided information has not yet demonstrated that the proposed project will not cause or contribute to water quality standards exceedances or significant degradation of the receiving waters." *Id.*

45.    On or about August 1, 2023, the Corps issued an individual section 404 permit for the Turkeyfoot Surface Mine authorizing Alpha to discharge dredged and/or and fill material into 20,356 linear feet of stream and 1.79 acres of wetland.

46.    Upon information and belief, the Corps did not require the applicant to include a discussion of anticipated effects on aquatic resource supported by information from other nearby operations.

47.    Upon information and belief, the Corps did not conduct nor require the applicant to conduct an analysis of the cumulative effects of mining discharges of sulfates, selenium, and other ions on Marsh Fork, Clear Fork, or Sandlick Branch.  This was despite the fact that the Corps recognized the presence of four large-scale surface mines in the vicinity of the Turkeyfoot mine. CE LRH-ED-E (File Number, LRH 2020-631-BCR), Memorandum for Record, Subject: Department of the Army Environmental Assessment and Statement of Findings for the Above-Referenced Standard Individual Permit Application.

48.    Discharge of dredged and/or fill material to construct the valley fills authorized by the Turkeyfoot Permit will increase TDS, sulfates, and conductivity in the receiving streams, thereby causing or contributing to violations of West Virginia's water quality standards..

49.    Comments on the application for the Turkeyfoot Permit alerted the Corps to the need to consider the cumulative impacts of the Turkeyfoot Surface Mine on downstream waters,

including the effects of ions, including sulfates and others characteristic of alkaline mine drainage, leading to increased conductivity which are known to degrade the biological communities below mining operations and particularly below valley fills. The Corps failed to provide a reasoned response to those comments.

50.    The Corps's conclusion that the permit issuance would comply with the restrictions on discharges in the 404(b)(1) Guidelines runs counter to the record is not based on reasoned decisionmaking.

51.    In issuing the Turkeyfoot Permit, the Corps stated that it "defers to and relies on the WVDEP reviews under Section 401 and 402 as adequate to assure minimization of potential adverse effects to the aquatic ecosystem and that the proposed discharge of fill material into waters of the U.S. would meet state water quality standards."

52.    In response to public comments regarding water quality concerns resulting from ionic pollutants, the Corps erroneously stated that 401 water quality certification is considered conclusive—ignoring the fact EPA advised that those same water quality aspects be considered.

53.    The Section 402 West Virginia/National Pollution Discharge Elimination System ("WV/NDPES") permit for the Turkeyfoot Surface Mine, WV/NPDES Permit Number WV1030175, does not include effluent limitations for TDS, conductivity, or other measures of ionic pollution.

54.    The Corps issued the Turkeyfoot Permit based on the erroneous belief that the WV/NPDES permit for the Turkeyfoot Surface Mine included limitations on TDS and the "same parameters" that commenters were concerned about.

55.    The Corps did not adequately address record evidence that its previous predictions of water quality standards compliance downstream from valley fills had proven demonstrably

wrong. The Corps provided no supported or reasoned explanation for why the ultimate results of constructing valley fills under the Turkeyfoot Permit would be different from the outcomes downstream of other valley fills permitted by the Corps, where demonstrable water quality standards are occurring despite the Corps's predictions that no such violations would occur. Instead, the Corps stated, without support, that the Turkeyfoot fills would be constructed from weathered sandstone, which would minimize the development of ionic pollution. The Corps did not require any chemical analysis of onsite material or site any scientific literature supporting its conclusions. Moreover, although the Corps stated that the Turkeyfoot fills would be built using "bottom-up" construction, the Corps ignored the fact that most, if not all, of the valley fills where its predictions of water quality standards compliance had been proven wrong were built with "bottom-up" construction. In other words, the Corps provided no explanation of why the Turkeyfoot fills would not result in water quality standards violations like those caused by a host of previous valley fills permitted by the Corps.

56.    The Corps avoided serious questions raised in public comments that the mine will contribute to water quality standards violations and significant degradation as the result of the discharge of ionic pollution. It ignored the numerous studies and data demonstrating that the Corps analysis in similar decisions had been proven wrong by subsequent data. The Corps dismissed this evidence, without supporting data or other analysis, saying only that, "[t]he applicant stated that due to past mining at the site and the prevalence of exposed and weathered sandstones near the top of the ridges of the site, the materials have lost most of the reactive sulfides, carbonates, and soluble ions load due to this exposure." The Corps did not quantify or explain the amount of material that would come from previously mined areas which include only 395 acres of the approved 1,086 acre surface area. The Corps did not quantify or explain how much of the spoil material deposited in

valley fills would consist of "weathered sandstone" from the tops of ridges. The Corps did not conduct nor require the applicant to conduct any testing or analysis of the weathered sandstone or other material to determine a sulfate or ionic pollutant load that would result from the mine. The Corps did no analysis of the impacts expected from fill material placed within and/or atop jurisdictional waters.

57.     The Corps failed to grapple with contrary record evidence in concluding that discharges authorized by the Turkeyfoot Permit would not cause or contribute to water quality standards violations. The Corps largely ignored public comments and dozens of scientific studies showing increased levels of ionic pollution from surface mining operations and valley fills and the resulting degradation of downstream waters. Although the Corps responded that fills at the site would be constructed using a "bottom up" method, the Corps ignored the fact that valley fills on most major surface mining operations have used this technique for decades. The Corps also wrote that "weathered sandstone" would be used to "minimize the development of cations/anions," but did no chemical analysis of the material onsite that would be used to construct valley fills and did not refer to any scientific studies or other information that would show use of such material avoids the issues detailed in the large volume of peer-reviewed literature in the administrative record. In fact, the Corps did not reference any of the published literature in the administrative record and did not directly address any of the conclusions reached by those studies.

58.     In response to public comments, the Corps repeatedly reiterated its view that the section 401 water quality certification is conclusive as to water quality parameters—despite specific advice and recommendations by the U.S. EPA as to water quality concerns.

59.     On issuance of the Turkeyfoot Permit, the Corps stated, "[t]he USEPA has reviewed the NPDES permit and did not advise of other water quality aspects that should be taken into consideration for this proposal."

60.     But, on December 27, 2020, EPA emailed WVDEP numerous comments on the NPDES permit for the Turkeyfoot Surface Mine and identified several water quality aspects that should be considered.

61.     Moreover, on July 14, 2021, EPA sent comments to the Corps on Alpha's application for the Turkeyfoot permit and advised the district engineer of other water quality aspects to be considered, including the effects of discharges of ions from valley fills on downstream waters.

62.     Despite public comments regarding cumulative impact, the Corps failed to address the effect of the discharge of ionic pollution on downstream waters that receive mining discharges from multiple permits.

63.     On issuance of the Turkeyfoot Permit, the Corps justified its acceptance of the applicant's mitigation plan because of its erroneous belief that a West Virginia Stream Condition Index Score of 70 in a re-established stream would indicate an un-impaired macroinvertebrate community and be considered successful. In fact, the record establishes that a West Virginia Stream Condition Index Score of 72 is required to demonstrate an unimpaired macroinvertebrate community and, hence, compliance with West Virginia's narrative water quality criteria.

64.     On information and belief, Plaintiffs allege that a "material handling plan" cannot prevent the discharge of high levels of ionic pollutants from a minesite through encapsulation and isolation. The material handling plan describes only acid-base accounting and selenium sampling, with no mention of sulfates or other ions most commonly associated with ionic toxicity. Moreover,

16

the material handling plan specifically excludes sampling of the overburden after mining commences.

65.    On information and belief, Plaintiffs allege that an Aquatic Ecosystem Protection Plan ("AEPP"), which relies upon best management practices, cannot successfully reduce ionic pollution to levels required to prevent degradation of aquatic resources and water quality standards violations. The plan relies on best management practices, and as demonstrated by the failure of other large surface mines to reduce ionic pollution, the record does not support the Corps's reliance on the applicant's AEPP.

66.    On issuance of the Turkeyfoot Permit, the Corps stated that "the coal to be removed is high-quality metallurgical coal which would be used in the coking process to manufacture steel and not for the generation of electricity so it's [*sic*] contribution to greenhouse gases would be minimal."

67.    On information and belief, combustion of metallurgical coal in steel manufacturing contributes greenhouse gases to a similar extent as combustion of coal for electricity generation.

68.    The Corps conceded that environmental justice communities exist in the vicinity of the Turkeyfoot Mine. However, when it considered the impacts to those populations, the Corps focused exclusively on what it perceived to be benefits to those communities looking only at employment and tax revenue during the life of the mining operation.

69.    The administrative record included voluminous scientific literature about the health and social impacts of mountaintop removal mining on adjacent communities, that were included in comments submitted by Plaintiffs. The Corps ignored all evidence of those negative impacts.

## CLAIMS

### Count One: Violations of the Clean Water Act Section 404(b)(1)

70.     Paragraphs 1 through 69 are incorporated herein by reference.

71.     The Section 404(b)(1) Guidelines provide that no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts on the aquatic ecosystems. 40 C.F.R. § 230.10(d).

72.     The Section 404(b)(1) Guidelines further provide that no discharge of fill materials into waters of the United States shall be permitted if it would cause or contribute to a violation of state water quality standards. 40 C.F.R. § 230.10(b)(1).

73.     To comply with the Section 404(b)(1) Guidelines, the Corps must make factual determinations and findings of compliance or noncompliance with the restrictions on discharges whose effects are not minimized or that would cause or contribute to violations of water quality standards. 40 C.F.R. §§ 230.11 & 230.12.

74.     The Corps has an independent obligation to consider water quality standards when brought to the Corps's attention by EPA. 40 C.F.R. § 320.4(d). The EPA brought issues related to water quality standards to the Corps attention in its June 2021 letter.

75.     Current scientific evidence shows that the valley fills permitted at this site will result in downstream impacts that will lead to degradation and impairment of the aquatic life use and will result in a violation of West Virginia's water quality standards.

76.     Analysis of previous mines with valley fills authorized by the Corps and the West Virginia DEP also shows that the Turkeyfoot Surface Mine will result in an increase of ionic pollution, degradation of aquatic communities, and a violation of West Virginia's water quality standards.

77.    The Corps failed to address the water quality standards as required under the Guidelines and as recommended by EPA.

78.    In the alternative, if the Corps did address the water quality standards, the project was nonetheless arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. There is no scientific basis, data, or other evidence supporting the conclusion that the Turkeyfoot mine will not cause degradation of aquatic life and a violation of applicable water quality standards. Instead, there is unrebutted evidence to the contrary.

79.    The Guidelines further provide that cumulative impacts must be considered. 40 C.F.R. § 230.11(g).

80.    The Corps failed to account for discharges from past, current, and future mining in the same watershed and account for the presence of cumulative impacts, including the effects of increased ionic pollution.

81.    The Corps ignored the potential for increased ionic pollution and unreasonably relied upon measures such as the use of weathered sandstone, durable rock fills, and a material handling plan to prevent such discharges.

82.    The Corps's conclusion that EPA had not recommended consideration of the effects of sulfates and other ions on downstream water quality was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

83.    The Corps's failure to provide a reasoned explanation for its decision in its response to record evidence that its past predictions of compliance with water quality standards downstream of valley fills it had authorized had been demonstrably wrong was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

84.     The Corps's failure to consider a body of scientific evidence demonstrating that valley fills cause impairment of aquatic life in downstream waters was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

85.     The Corps's reliance on a false impression that the terms of the Turkeyfoot Surface Mine's NPDES permit to conclude that the authorized discharges will not cause or contribute to water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

86.     The Corps's reliance on a false impression of the threshold for stream impairment to conclude that the applicant's proposed mitigation plan would prevent water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

87.     These violations of the CWA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

**Count Two: Violations of the Corps's Public Interest Review Regulations**

88.     Paragraphs 1 through 87 are incorporated herein by reference.

89.     The Corps's public interest review regulations require it to weigh "[t]he benefits which reasonably may be expected to accrue from the proposal … against its reasonably foreseeable detriments." 33 C.F.R. § 320.4. Among the factors that the Corps must consider in its public interest review are "general environmental concerns, water quality, and the needs and welfare of the people." *Id.*

90.     The Corps has no reasoned basis to conclude that ionic pollution from the mine will not result in degradation of water quality and aquatic ecosystems in downstream waters.

91.    The Corps has no reasoned basis for rejecting the conclusions of dozens of peer-reviewed scientific articles showing that surface mines and valley fills lead to significant increases of ionic pollution and degradation of downstream waters.

92.    The Corps failed to consider the cumulative impacts of the discharge of several mines on the receiving waters—particularly because each mine contributes ionic pollutants.

93.    The Corps rejected EPA's comments, reached a contrary conclusion regarding degradation without supporting evidence, and erroneously relied upon the West Virginia 401 certification as conclusive for water quality issues.

94.    The Corps failed to explain how its conclusions as to ionic pollution at the Turkeyfoot Mine will be accurate, when it has been demonstrably wrong in similar circumstances over the past several years.

95.    The Corps has no reasoned basis to conclude that an AEPP, a material handling plan, the use of weathered sandstone, or "bottom up" valley fill construction will prevent the release of high concentrations of ionic pollutants and prevent the degradation of downstream waters.

96.    The Corps erroneously concluded that the NPDES permit for the Turkeyfoot mine contains limitations on ionic pollutants.

97.    The Corps erroneously concluded that a target West Virginia Stream Condition Index score of 70 would be sufficient to demonstrate that mitigation had restored streams sufficiently to adequately support aquatic life.

98.    The Corps's conclusion that EPA had not recommended consideration of the effects of sulfates and other ions on downstream water quality was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

99.     The Corps's failure to provide a reasoned explanation for its decision in its response to record evidence that its past predictions of compliance with water quality standards downstream of valley fills it had authorized had been demonstrably wrong was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

100.    The Corps's failure to consider a body of scientific evidence demonstrating that valley fills cause impairment of aquatic life in downstream waters was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

101.    The Corps's reliance on a false impression that the terms of the Turkeyfoot Surface Mine's NPDES permit to conclude that the authorized discharges will not cause or contribute to water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

102.    The Corps's reliance on a false impression of the threshold for stream impairment to conclude that the applicant's proposed mitigation plan would prevent water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

103.    The Corps's conclusion that greenhouse gas emissions would be minimal because coal from the project "would be used in the coking process to manufacture steel and not for the generation of electricity" was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

104.    The Corps's focus on the purported benefits of the project to environmental justice communities without balancing those alleged benefits against negative impacts was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

105.    These violations of the public interest review requirements and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

**Count Three: Violations of the National Environmental Policy Act**

106.    Paragraphs 1 through 105 are incorporated herein by reference.

107.    The Corps's failure to perform an Environmental Impact Statement on the Turkeyfoot Mine violates NEPA and is arbitrary and capricious because the Corps failed to take a hard look at the environmental impacts of the project in the following respects:

   a.  The Corps has no reasoned basis to conclude that ionic pollution from the mine will not result in degradation of water quality and aquatic ecosystems in downstream waters;

   b.  The Corps has no reasoned basis for rejecting the conclusions of dozens of peer-reviewed scientific articles showing that surface mines and valley fills lead to significant increases of ionic pollution and degradation of downstream waters;

   c.  The Corps failed to consider the cumulative impacts of the discharge of several mines on the receiving waters of Marsh Fork, and Clear Fork—particularly because each mine contributes ionic pollutants;

   d.  The Corps rejected EPA's comments, reached a contrary conclusion regarding degradation without supporting evidence, and erroneously relied upon the West Virginia 401 certification as conclusive for water quality issues;

   e.  The Corps failed to explain how its conclusions as to ionic pollution at the Turkeyfoot Mine will be accurate, when it has been demonstrably wrong in similar circumstances over the past several years;

f.  The Corps has no reasoned basis to conclude that an AEPP, a material handling plan, the use of weathered sandstone, or bottom-up fill construction will prevent the release of high concentrations of ionic pollutants and prevent the degradation of downstream waters;

g.  The Corps erroneously concluded that the NPDES permit for the Turkeyfoot mine contains limitations on ionic pollutants;

h.  The Corps erroneously concluded that a target West Virginia Stream Condition Index Score of 70 would be sufficient to demonstrate that mitigation had restored streams sufficiently to support aquatic life;

i.  The Corps's conclusion that EPA had not recommended consideration of the effects of sulfates and other ions on downstream water quality was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

j.  The Corps's failure to provide a reasoned explanation for its decision in its response to record evidence that its past predictions of compliance with water quality standards downstream of valley fills it had authorized had been demonstrably wrong was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

k.  The Corps's failure to consider a body of scientific evidence demonstrating that valley fills cause impairment of aquatic life in downstream waters was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

l.  The Corps's reliance on a false impression that the terms of the Turkeyfoot Surface Mine's NPDES permit to conclude that the authorized discharges will

not cause or contribute to water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

m. The Corps's reliance on a false impression of the threshold for stream impairment to conclude that the applicant's proposed mitigation plan would prevent water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

n. The Corps's conclusion that greenhouse gas emissions would be minimal because coal from the project "would be used in the coking process to manufacture steel and not for the generation of electricity was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; and

o. The Corps's NEPA review was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because the analysis considered only benefits of the project to environmental justice communities, without balancing those alleged benefits against negative impacts.

108. Alternatively, the Corps's conclusion that the Turkeyfoot Surface Mine would not have a significant impact on the human environment was flawed in such a manner that it cannot yet be said whether the project may have a significant impact for the following reasons:

a. The Corps has no reasoned basis to conclude that ionic pollution from the mine will not result in degradation of water quality and aquatic ecosystems in downstream waters;

b. The Corps has no reasoned basis for rejecting the conclusions of dozens of peer-reviewed scientific articles showing that surface mines and valley fills lead to significant increases of ionic pollution and degradation of downstream waters;

c. The Corps failed to consider the cumulative impacts of the discharge of several mines on the receiving waters of Marsh Fork, and Clear Fork—particularly because each mine contributes ionic pollutants;

d. The Corps rejected EPA's comments, reached a contrary conclusion regarding degradation without supporting evidence, and erroneously relied upon the West Virginia 401 certification as conclusive for water quality issues;

e. The Corps failed to explain how its conclusions as to ionic pollution at the Turkeyfoot Mine will be accurate, when it has been demonstrably wrong in similar circumstances over the past several years;

f. The Corps has no reasoned basis to conclude that an AEPP, a material handling plan, the use of weathered sandstone, or bottom-up fill construction will prevent the release of high concentrations of ionic pollutants and prevent the degradation of downstream waters;

g. The Corps erroneously concluded that the NPDES permit for the Turkeyfoot mine contains limitations on ionic pollutants;

h. The Corps erroneously concluded that a target West Virginia Stream Condition Index Score of 70 would be sufficient to demonstrate that mitigation had restored streams sufficiently to support aquatic life;

i.  The Corps's conclusion that EPA had not recommended consideration of the effects of sulfates and other ions on downstream water quality was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

j.  The Corps's failure to provide a reasoned explanation for its decision in its response to record evidence that its past predictions of compliance with water quality standards downstream of valley fills it had authorized had been demonstrably wrong was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

k.  The Corps's failure to consider a body of scientific evidence demonstrating that valley fills cause impairment of aquatic life in downstream waters was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

l.  The Corps's reliance on a false impression that the terms of the Turkeyfoot Surface Mine's NPDES permit to conclude that the authorized discharges will not cause or contribute to water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

m.  The Corps's reliance on a false impression of the threshold for stream impairment to conclude that the applicant's proposed mitigation plan would prevent water quality standards violations was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

n.  The Corps's conclusion that greenhouse gas emissions would be minimal because coal from the project "would be used in the coking process to manufacture steel and not for the generation of electricity was arbitrary,

capricious, an abuse of discretion, and otherwise not in accordance with law; and

o.  The Corps's NEPA review was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because the analysis considered only benefits of the project to environmental communities, without balancing those alleged benefits against negative impacts.

109.  These violations of NEPA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

**RELIEF**

Wherefore, Plaintiffs request that the court grant the following relief.

1.  Declare that the Corps's issuance of a section 404 permit for the Turkeyfoot Surface Mine violates the CWA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law in violation of the APA.

2.  Declare that the Corps's issuance of a section 404 permit for the Turkeyfoot Surface Mine violates the Corps's public interest review requirements and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law in violation of the APA.

3.  Declare either that (1) the Corps's failure to complete an EIS on the Turkeyfoot Surface Mine violates NEPA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the APA, or (2) the Corps's NEPA analysis is so flawed that it cannot yet be determined whether the Turkeyfoot Surface Mine will have a significant impact on the human environment.

4.  Order the Corps to immediately suspend or revoke the section 404 permit for the Turkeyfoot Surface Mine during the pendency of this litigation.

5.      Vacate the section 404 permit for the Turkeyfoot Surface Mine.

6.      Award Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness fees, as authorized by 28 U.S.C. § 2412(d)(2)(A). And,

7.      Grant Plaintiffs such further relief as the Court deems appropriate.


Dated: February 19, 2025          **/s/ Derek O. Teaney**
                                   DEREK O. TEANEY (WVBN 10223)
                                   J. MICHAEL BECHER (WVBN 10588)
                                   JOSEPH M. LOVETT (WVBN 6926)
                                   APPALACHIAN MOUNTAIN ADVOCATES, INC.
                                   P.O. Box 507
                                   Lewisburg, WV 24901
                                   Telephone: (304) 646-1182
                                   Email: dteaney@appalmad.org

                                   *Counsel for Plaintiffs*

29